# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Spectrum Community Services, Inc.,   :
                    Petitioner   :
                                 :
           v.              :   No. 679 C.D. 2020
                                 :   Submitted:  February 26, 2021
Unemployment Compensation Board  :
of Review,                     :
                   Respondent   :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**              **FILED:  May 24, 2021**

Spectrum Community Services, Inc. (Employer) petitions for review of the June 22, 2020 Order of the Unemployment Compensation (UC) Board of Review (Board) finding Theresa M. Griffiths (Claimant) was not ineligible for benefits pursuant to Section 402(b) of the UC Law (Law).[1]  On appeal, Employer argues the Board erred because the three isolated incidents that Claimant had with the Chief Executive Officer (CEO) of Employer were not sufficient to create abusive, hostile, or intolerable working conditions, which would constitute a necessitous and

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b), which provides, in relevant part, that "[a]n employe shall be ineligible for compensation for any week . . . [i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature . . . ."

compelling reason to voluntarily quit. Based upon the Board's findings of fact and a review of the record and relevant caselaw, we disagree. Accordingly, we affirm.

## I. BACKGROUND

Claimant last worked for Employer as a health coordinator in December 2019. In January 2020, Claimant filed an application for UC benefits, wherein she stated she voluntarily quit her position with Employer because of "[d]efamation of character which made it a hostile work environment for me." (Reproduced Record (R.R.) at 10a.) Claimant detailed numerous incidents with CEO over the past year. (*Id.* at 11a.) At the request of a UC Service Center Representative, Claimant also provided various supporting documents. Employer was sent a questionnaire requesting information about Claimant's separation from employment, but it was not returned. (*Id.* at 13a-15a.) Based upon the information it had, the UC Service Center issued a Notice of Determination on January 28, 2020, finding Claimant ineligible for benefits under Section 402(b). Claimant filed a timely appeal, and a hearing before a Referee was scheduled.

At the hearing, Claimant, then proceeding pro se, testified on her own behalf, and Employer's Vice President of Quality Assurance and Continuous Improvements (Vice President) represented Employer. Claimant testified as follows. Claimant submitted a resignation letter in which she wrote that she felt CEO was "very degrading" to her over the last year, starting with her marriage. (*Id.* at 48a.) It culminated in an email that Vice President sent Claimant, recounting a discussion Vice President had with CEO about Claimant's work arrangement. (*Id.*) The email stated, in pertinent part, "When I shared your conversation with me stating 'a special agreement' to work from your home office, [CEO] reported that is by far not true

2

and must cease. He also made clear . . . he does not like liars." (*Id.* at 83a.) Claimant responded to Vice President that she does not lie, that she acknowledged the agreement to work from home was not in writing, and that she was told that she would have an office at Employer's Jim Thorpe office. (*Id.*)

Claimant testified that she was upset by the email and told colleagues who were sitting there that she "can't do this anymore[] because I am not a liar. I do not lie. And if he felt that way, why would he say it to somebody else? Because, to me, that's defamation of character." (*Id.* at 49a.) She worked another day and a half before taking off for a scheduled vacation over the holidays and resigned December 30, 2019. Claimant acknowledged that Vice President encouraged Claimant to reach out to CEO, but Claimant testified that CEO does not read his own emails. She also testified that "there's nobody to go to above [CEO]." (*Id.* at 50a.) The Referee asked Claimant if "the reason [she] left the employment [was] because of the December 18, 2019 e[]mail or for some other reason," to which Claimant responded, "[i]t was a whole buildup of the past year and the degrading nature that [CEO] has been doing." (*Id.* at 58a.) The Referee then asked Claimant if she would have quit if she had not received the email, to which Claimant responded, "Not at that point, no." (*Id.*) Claimant continued that the email was "the final straw" and that "it was a buildup over a year . . . ." (*Id.* at 58a, 60a.) Claimant then detailed two other incidents involving CEO. The first occurred during a retreat in October 2019 at which CEO called Claimant a "wimp" for not confronting another employee who had been rude to her, which prompted another employee to also call Claimant a "wimp." (*Id.* at 60a-61a.) When Claimant then asked CEO about a company vehicle, CEO said "f[***] you," and threw papers at Claimant in front of other employees. (*Id.* at 61a.) Claimant testified that she told CEO "F you, too," and

3

walked out. (*Id.*) She told another employee that she thought she might get fired but was "at the end of [her] rope." (*Id.*) The second incident occurred at the prior year's retreat, at which time CEO told Claimant her "husband was beneath [her]" and that "he's probably sleeping with the [ex-]wife." (*Id.*) Towards the end of the hearing, the Referee summarized Claimant's testimony stating Claimant "quit the employment as a result of [the] December 18[,] 2019 e[]mail, being the culmination of a pattern of conduct involving CEO," which Claimant confirmed as accurate. (*Id.* at 71a.) When asked by Claimant about CEO's treatment of Claimant since Claimant got married, Vice President stated that she could not testify to such as she had only returned to the company and started supervising Claimant in November, one month before Claimant resigned. (*Id.* at 67a.) Vice President testified that she urged Claimant to discuss the email with CEO, which was confirmed by a series of text messages between Claimant and Vice President that was admitted into evidence. Claimant responded via text message that calling her a liar was defamation of character. (Dec. 30, 2019 Text Messages, R.R. at 78a.) The next text message stated: "This is [CEO]. Let's stop this back and forth. If this is your decision[,] let's just move on. I hold no ill feelings towards you." (*Id.*) Although the text message appears to have been sent on December 30, 2019, Claimant testified that she did not see CEO's response until the Sunday before the Referee's hearing. (*Id.* at 54a.)

Based upon the evidence presented, the Referee issued a Decision on March 5, 2020, finding Claimant did not have a necessitous and compelling reason for voluntarily quitting her employment and, therefore, was ineligible for benefits pursuant to Section 402(b) of the UC Law.

4

Claimant then timely appealed to the Board, which reversed the Referee's Decision. In doing so, the Board made the following relevant findings of fact:

2. The [C]laimant felt that the [E]mployer's CEO was degrading to her since she got married.

3. At the [E]mployer's 2018 retreat, [] CEO told the [C]laimant that her husband was beneath her and probably was still sleeping with his ex-wife.

4. At the [E]mployer's [] 2019 retreat,[2] [] CEO questioned the [C]laimant about not having an office and paying so much for ink to print things out. The [C]laimant related a situation where an employee at the [E]mployer's Jim Thorpe office was rude because she stopped the printer to print something out. [] CEO inquired if the [C]laimant said something to the employee. The [C]laimant replied no, but said she wanted to. [] CEO and another employee called the [C]laimant a wimp. The [C]laimant thereupon complained to [] CEO about getting a new company car and/or the poor condition of her current company car. [] CEO then told the [C]laimant, "f*** you," as he threw papers at her. The [C]laimant said, "F you," in return, and walked out.

5. On December 18, 2019, the [C]laimant's supervisor sent the [C]laimant an email outlining a discussion the supervisor had with [] CEO about, among other things, a "special arrangement" allowing the [C]laimant to work from her home office. The supervisor reported in the email that [] CEO replied that this was not true and that he does not like liars.

6. The [C]laimant worked the next day, a portion of the following day, and took paid time off around the holidays.

7. The [C]laimant texted her supervisor on December [30], 2019,[3] advising that she was going to submit her resignation because she felt

---

[2] The Board found that the retreat occurred in July 2019, but the testimony shows it occurred in October 2019. The Board acknowledges this error in its brief. (*See* Board Brief (Br.) at 3 n.2.)

[3] The Board found the text messages were sent on December 23, 2019, but the text messages introduced as evidence show they were sent on December 30, 2019. The Board also acknowledges this error in its brief. (*See* Board's Br. at 4 n.3.)

the environment was too hostile and citing [] CEO's reported comment about not liking liars. [] CEO's accusation or implication that [C]laimant was inaccurate [sic].

8. The [C]laimant resigned because of [] CEO's pattern of conduct.

(Board's Opinion (Op.), Findings of Fact (FOF) ¶¶ 2-8.)

Based upon these findings, the Board concluded that Claimant met her burden of showing a necessitous and compelling reason for voluntarily quitting. The Board explained:

> An employee who is subject to unjust accusations, abusive conduct, or profanity at the workplace has necessitous and compelling reason to terminate employment, provided notice of the conduct has been given to the employer. Here, the [C]laimant credibly testified to a pattern of conduct involving the [E]mployer's CEO, which included degrading remarks about the [C]laimant's husband, calling the [C]laimant a wimp, telling the [C]laimant "f*** you," throwing papers at her, and finally, implying that she was a liar in a discussion with her supervisor.

(Board Op. at 2.)

The Board further stated that "[C]laimant realistically had nowhere else in the company to complain[] since the perpetrator was [] CEO." (*Id.*) Accordingly, the Board concluded that Claimant was not ineligible for UC benefits under Section 402(b). (*Id.* at 3.) Employer now petitions for review of the Board's Order.

## II. PARTIES' ARGUMENTS

On appeal,[4] Employer argues the Board erred in concluding that the three isolated incidents between Claimant and CEO were sufficient to constitute a

---

[4] "Our review is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Johns v. Unemployment Comp. Bd. of Rev.*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014).

necessitous and compelling reason to voluntarily quit her employment. In order to constitute a necessitous and compelling reason, Employer asserts one's working conditions must be intolerable, not merely uncomfortable, and must result in real and substantial pressure. Here, Employer argues, the three incidents were isolated, having occurred over a span of a year and a half, and two of the incidents were remote to Claimant's resignation. Furthermore, Employer claims that the incident involving the email is not an unjust accusation since Claimant admits that there is no documentation that she was allowed to work from home. According to Employer, the Board ignored Claimant's testimony that she would not have quit but for the email. Regardless, whether the email is considered alone or in conjunction with the other two incidents, Employer argues the evidence was insufficient to support a conclusion that Claimant was under real, substantial pressure, such that a reasonable person would have resigned.

In addition, Employer contends Claimant did not take any steps to preserve her employment. Employer argues that Claimant was told to discuss the situation with CEO and did not do so. Further, although CEO told Claimant that a discussion would not be useful, Employer points out that Claimant did not see CEO's comment until the Sunday before the Referee's hearing; thus, it could not excuse her failure to try to preserve her employment because she was unaware of such.

The Board responds that abusive, hostile, or intolerable working conditions can serve as a necessitous and compelling reason for voluntarily quitting one's employment, as can unjust accusations of dishonesty. The Board argues that "[o]ver the final year or so of her employment, Claimant was subjected to repeated insults and disparaging remarks vilifying her husband and besmirching her own character, as well as a profane outburst where papers were thrown at the [C]laimant, all at the

hands of [] CEO." (Board's Brief (Br.) at 10-11.) The Board also disputed Employer's characterization that the 3 incidents occurred over the span of a year and a half and instead asserts that it was only 14 months and that the last 2 occurred within 2 months of one another. Furthermore, the Board notes that the incidents occurred in front of Claimant's colleagues. The Board contends that Employer's reliance on *Ann Kearney Astolfi, DMD, PC v. Unemployment Compensation Board of Review*, 995 A.2d 1286 (Pa. Cmwlth. 2010), is misplaced because being yelled at for talking too much is not equivalent to being called names and being accused of dishonesty. Instead, the Board asserts the instant matter is analogous to *Arufo v. Unemployment Compensation Board of Review*, 391 A.2d 43 (Pa. Cmwlth. 1978), where the claimant was accused of theft and the Court held this accusation was sufficient to constitute a necessitous and compelling reason to voluntarily quit. Finally, the Board acknowledges that a claimant has an obligation to preserve one's employment but not if such efforts would be futile. Here, the Board argues it would have been futile for Claimant to talk to anyone because it was CEO who was the alleged perpetrator.

Employer filed a reply brief, wherein it argues the Board's arguments are contradicted by the facts, namely, Claimant's testimony that the first two incidents did **not** play a role in her decision to quit. Employer also argues that CEO never directly called Claimant a liar, and even if CEO did, Claimant was not "**falsely** accused." (Employer's Reply Br. at 2 (emphasis in original).) According to Employer, the cases cited by the Board involved evidence showing the accusations were false, which is not present here. Employer argues it is not enough to merely believe you have been wrongfully accused. Accordingly, Employer asks the Court to reverse the Board's Order.

## III.    DISCUSSION

Under Section 402(b) of the UC Law, "[w]here a claimant has voluntarily quit employment, in order to obtain benefits, [the claimant] must show that [the claimant] left [his or her] employment for necessitous and compelling reasons." *Collier Stone Co. v. Unemployment Comp. Bd. of Rev.*, 876 A.2d 481, 484 (Pa. Cmwlth. 2005). Here, it is undisputed that Claimant voluntarily left her employment.  Thus, the burden is on Claimant to show that she had a necessitous and compelling reason to do so. *Latzy v. Unemployment Comp. Bd. of Rev.*, 487 A.2d 121, 123 (Pa. Cmwlth. 1985).  To satisfy this burden, Claimant must demonstrate that:  "(1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve [her] employment." *Brunswick Hotel & Conf. Ctr., LLC v. Unemployment Comp. Bd. of Rev.*, 906 A.2d 657, 660 (Pa. Cmwlth. 2006). Whether a claimant had necessitous and compelling reasons for terminating his employment is a question of law subject to review by this Court.  *Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1261 (Pa. Cmwlth. 2015).

"Mere dissatisfaction with one's working conditions does not constitute cause of a necessitous and compelling nature for terminating one's employment." *Brunswick Hotel*, 906 A.2d at 660.  Likewise, "[p]ersonality conflicts, absent an intolerable work atmosphere, do not amount to a necessitous and compelling cause for leaving one's employment." *Wert v. Unemployment Comp. Bd. of Rev.*, 41 A.3d 937, 940 (Pa. Cmwlth. 2012).  However, the Court has recognized that "abusive conduct" may constitute a necessitous and compelling reason to voluntarily quit. *First Fed. Sav. Bank v. Unemployment Comp. Bd. of Rev.*, 957 A.2d 811, 816 (Pa.

9

Cmwlth. 2008). This includes being called names or being "subject to criticism and ridicule from [a superior] that was uncalled for and incorrect." *Id.* at 817. Similarly, an accusation of dishonesty or theft can serve as a necessitous and compelling reason to justify voluntarily quitting. *Arufo*, 391 A.2d at 45. Even "a single accusation, if the circumstances surrounding the incident warrant, may produce sufficient pressure to terminate employment that would compel a reasonable person to act." *Sol Neft Sports v. Unemployment Comp. Bd. of Rev.*, 610 A.2d 539, 541 (Pa. Cmwlth. 1992) (emphasis omitted).

In *Arufo*, a supervisor suggested the claimant was responsible for $2,000 that was missing, despite an audit that was conducted showing nothing amiss. The claimant quit as a result of the accusation. The Board found the claimant was ineligible for benefits. On appeal, we reversed, holding that an accusation of theft "constituted a very real, substantial, and serious personal affront to claimant's character and integrity," particularly "after an independent audit had cleared [the] claimant of any wrongdoing." *Arufo*, 391 A.2d at 45. We further explained that "[t]here was nothing more that [the] claimant could do to overcome the suspicions and restore the confidence in her work." *Id.* Therefore, we found that the claimant had a necessitous and compelling reason for voluntarily leaving her employment and that working for another month did not negate that reason. *Id.*

This Court reached a similar result in *Indiana University of Pennsylvania, State System of Higher Education v. Unemployment Compensation Board of Review*, 202 A.3d 195 (Pa. Cmwlth. 2019) (*IUP*). There, we held that the employer's treatment of the claimant during an investigation into alleged misconduct constituted a necessitous and compelling reason to justify the claimant voluntarily quitting her

10

employment because it "created suspicions that would reflect poorly on [the c]laimant's character and integrity." *Id.* at 205. We stated:

> [The e]mployer interviewed all of [the c]laimant's co-workers concerning the allegations levelled against [the c]laimant but failed to give [the c]laimant any information concerning the allegations aside from the fact that the allegations were serious. Further, [the e]mployer removed [the c]laimant from her office and relocated her to a building where she had no contact with her coworkers and did not have all the equipment necessary to fulfill her work duties. [The e]mployer compounded the removal by not permitting [the c]laimant to re-enter her office unless she had an escort. All of these circumstances created an image of suspicion that would call [the c]laimant's integrity into question. Just as in *Arufo* and *Sol Neft Sports*, the accusations levelled against [the c]laimant combined with [the e]mployer's actions in response to the allegations created an untenable situation compelling [the c]laimant to leave her employment.

*Id.*

Here, the Board found Claimant quit after enduring a year of degradation by CEO, culminating in a December 2019 email in which CEO accused Claimant of lying. Similar to the claimants in *Arufo* and *IUP*, this accusation of dishonesty cast aspersions on Claimant's integrity and character, which constituted a necessitous and compelling reason for leaving her employment. CEO told Vice President, who was Claimant's supervisor, that Claimant's alleged "special agreement" to work from home "by far [was] not true and must cease" and that "he does not like liars." (R.R. at 83a.) While Employer is correct that CEO never directly called Claimant a liar, (Employer's Reply Br. at 2), the implications of his statements are clear.

The Court is also not persuaded by Employer's argument that, even if CEO did call Claimant's honesty into doubt, Claimant was not "**falsely** accused." (Employer's Reply Br. at 2 (emphasis in original).) Employer asserts Claimant must

11

come forth with evidence that the statement is not true and, here, Claimant admits there is no written evidence of a "special agreement" permitting Claimant to work from home. In *Berardi v. Unemployment Compensation Board of Review*, 458 A.2d 668 (Pa. Cmwlth. 1983), the claimant voluntarily quit after being accused of being drunk, not properly supervising maids, committing theft, and having an affair with a coworker. The claimant's supervisor testified that she did not intend to infer that the claimant was stealing and denied other allegations. The referee credited the supervisor's testimony, finding, instead, that the claimant misinterpreted it. The Board subsequently adopted the referee's decision. On appeal, we affirmed, concluding that, based upon the credited evidence, the claimant only demonstrated a **belief** that she was being harassed, discriminated against, or defamed. *Id.* at 670.

Unlike in *Berardi*, here, CEO did not testify and the Board credited Claimant's testimony. Therefore, there is no evidence, like there was in *Berardi*, that the statement either was not made, which, of course, would be contradicted by the email itself, or was not intended negatively. Further, we discern no reason that a claimant seeking UC benefits must come forth with solid evidence to prove an employer's accusation was, indeed, false. Claimant acknowledged there was no written agreement confirming she was permitted to work from home and testified she did not lie, which is consistent with her email response to Vice President. The fact that Claimant cannot produce documentary evidence that admittedly does not exist should not be fatal to her claim for UC benefits where the Board credited her uncontradicted testimony. "[T]he [Board] is the ultimate fact-finder in [UC] matters . . . ." *Sipps v. Unemployment Comp. Bd. of Rev.*, 181 A.3d 479, 484 (Pa. Cmwlth. 2018) (citation omitted). As the fact-finder, it is entitled to make its own credibility determinations regarding witnesses and to resolve any evidentiary conflicts within

12

its discretion, and these credibility determinations are not reviewable on appeal. *Serrano v. Unemployment Comp. Bd. of Rev.*, 149 A.3d 435 (Pa. Cmwlth. 2016).

While the email alone was likely sufficient to constitute a necessitous and compelling reason for voluntarily quitting, *Sol Neft Sports*, 610 A.2d at 541, the Board also considered the other incidents between CEO and Claimant: making disparaging remarks about Claimant's husband, calling Claimant a "wimp," and telling Claimant "f[***] you" while throwing papers at her.[5] The Board could determine these incidents, although more remote in time, demonstrate an ongoing pattern of abusive or harassing conduct by CEO toward Claimant. Employer argues the Board erred in considering them because Claimant testified that, but for the email, she would not have quit. However, Employer selectively focuses on one of Claimant's responses to a question by the Referee without consideration of the entirety of Claimant's testimony. "The Board's findings of fact are conclusive on appeal only so long as the record, **taken as a whole**, contains substantial evidence to support them." *IUP*, 202 A.3d at 203 (emphasis added) (citation omitted). Substantial evidence is "relevant evidence upon which a reasonable mind could base a conclusion." *Henderson v. Unemployment Comp. Bd. of Rev.*, 77 A.3d 699, 718 (Pa. Cmwlth. 2013). In addition, "[i]n determining whether there is substantial

---

[5] While it is true that Claimant said, "F you, too," to CEO, (R.R. at 61a), this was only after CEO had already used profane language toward Claimant and threw papers at her. We have held that an employee's outburst that is provoked by the employer does not constitute willful misconduct that disqualifies the claimant from UC benefits. *See, e.g.*, *Kowal v Unemployment Comp. Bd. of Rev.*, 512 A.2d 812 (Pa. Cmwlth. 1986) (the supervisor was berating claimant at the time she threw her notebook at him and told him to shove it); *Penn Forest Township v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 1976 C.D. 2014, filed July 7, 2015) (the claimant and supervisor were engaged in a verbal confrontation, which the supervisor initiated by yelling profanities at the claimant); *Campbell v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 369 C.D. 2014, filed Feb. 17, 2015) (the claimant called another employee a bitch after her supervisor yelled and cursed at her). If such conduct does not disqualify a claimant from benefits as willful misconduct, we discern no reason it should disqualify a claimant in a voluntary quit case.

13

evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party," here, Claimant, "giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence." *Id.* Moreover, "[i]t is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made." *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008).

From the time she first applied for benefits through the hearing before the Referee, Claimant has consistently stated that it was the series of incidents over the course of a year that led her to quit and that the email was the "final straw." (R.R. at 10a-11a, 48a, 58a, 60a-61a, 71a.) Claimant did state, in response to the Referee's question, that she would not have quit if she had not received the email. (*Id.* at 58a.) However, immediately before this statement, in response to another question by the Referee asking Claimant if "the reason [she] left the employment [was] because of the December 18, 2019 e[]mail or for some other reason," Claimant responded, "It was a whole buildup of the past year and the degrading nature that [CEO] has been doing," and shortly after this statement, Claimant reiterated that the email was "the final straw" and that "it was a buildup over a year . . . ." (*Id.* at 58a, 60a.) The Referee also understood that Claimant quit her job because of CEO's pattern of conduct. (*See id.* at 71a (Referee summarizing Claimant's testimony as to the reason she quit was the "result of [the] December 18[] 2019 e[]mail, being the culmination of a pattern of conduct involving [CEO,]" which Claimant confirmed as accurate).) Employer's argument that the email alone was the sole reason Claimant quit borders on disingenuous.

Regardless of whether it was the email alone or a combination of incidents between CEO and Claimant, under our precedent, the Board did not err in determining Claimant had a necessitous and compelling reason for voluntarily leaving her employment. CEO's actions towards and statements about Claimant "produced real and substantial pressure to terminate employment[,]" which "would compel a reasonable person to [do] the same . . . ." *Brunswick Hotel*, 906 A.2d at 660. We cannot conclude Claimant did not act "with ordinary common sense" when she quit after the remarks CEO made about her and her husband. *Id.*

However, before voluntarily leaving one's employment, a claimant must establish both that the claimant "acted with ordinary common sense and . . . made a reasonable effort to preserve [the claimant's] employment." *Spadaro v. Unemployment Comp. Bd. of Rev.*, 850 A.2d 855, 860 (Pa. Cmwlth. 2004). Even assuming the Court concluded Claimant had a necessitous and compelling reason for quitting, as we do, Employer argues Claimant failed to take make any effort, let alone a reasonable one, to preserve her employment. Again, we disagree. In *Autumn Ridge Enterprises v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 1818 C.D. 2008, filed March 6, 2009), slip op. at 5, we held it would be futile for a claimant who was sexually assaulted by an owner to report the assaults to the "employer." Here, the abusive and harassing conduct was at the hands of CEO. As Claimant testified, "[T]here's nobody to go to above [CEO]." (R.R. at 50a.) Therefore, it would have been futile for Claimant to complain.

## IV. CONCLUSION

Based upon the Board's findings, which are supported by substantial evidence, we discern no error in the Board's conclusion that Claimant had a

necessitous and compelling reason for voluntarily quitting her employment and that there were no steps she could take to preserve her employment when the alleged abuse and harassment came from CEO of Employer himself.  Accordingly, we affirm the Board's Order.

_____

**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Spectrum Community Services, Inc., : 
                  Petitioner : 
                   : 
          v. :   No. 679 C.D. 2020
                   : 
Unemployment Compensation Board : 
of Review, : 
               Respondent : 

# O R D E R

NOW, May 24, 2021, the Order of the Unemployment Compensation Board of Review, in the above-captioned matter, is **AFFIRMED**.

_____

**RENÉE COHN JUBELIRER,** Judge